UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | 3:17-CR-30004-02-RAL |
|---|---|
| Plaintiff, | |
| vs. | OPINION AND ORDER DENYING MOTION FOR ACQUITTAL OR NEW TRIAL |
| JESSE J. WALN, | |
| Defendant. | |

A jury convicted Defendant Jesse J. Waln (Jesse)[1] of two separate counts of possession of a stolen firearm, and acquitted Jesse of one count of first degree burglary and two separate counts of larceny. Docs. 345, 346. Jesse now has filed a Motion for Acquittal or New Trial, Doc. 358, and a supporting Memorandum of Law, Doc. 359, arguing that there was insufficient evidence to sustain his conviction under Rule 29 of the Federal Rules of Criminal Procedure, or alternatively, the verdict was contrary to the weight of the evidence justifying a new trial under Rule 33 of the Federal Rules of Criminal Procedure. For the reasons explained herein, this Court denies the Motion for Acquittal or New Trial.

I.   Facts

Jesse was indicted along with codefendants Jeremiah R. Waln (Jeremy), Dakota James Marshall (Marshall), Dominic Joseph Stoneman, Danielle Marissa White Eyes (White Eyes), and Ronald F. Moran (Moran), in a ten-count indictment alleging various counts of first degree

---

[1] The trial testimony mentioned five members of the Waln family, so this Opinion and Order uses the Defendant's first name and the first name or nickname of Defendant's brothers and parents.

1

burglary, larceny, possession of stolen firearms, drug user in possession of a firearm, and accessory after the fact. Docs. 1, 2. Jesse's five codefendants all reached plea agreements with the United States and pleaded guilty before trial. On the eve of his trial, Jesse petitioned to plead guilty and entered guilty pleas on one count of first degree burglary and one count of larceny relating to a burglary and larceny of the Patricia Burnette and Peggy Diekhoff home in May of 2016 in Mission, South Dakota. Docs. 312, 320.

The remaining charges against Jesse involved separate counts of first degree burglary and larceny of the Beau Westover home between November 11 and 13, 2016, a larceny charge concerning theft of property belonging to Keller Electric between November 11 and 13, 2016, and two separate counts of possession of stolen firearms, specifically a Savage .204 caliber rifle bearing serial number J365798 and a Benelli SuperNova .12 gauge shotgun bearing serial number Z718035H14. Jesse's jury trial extended from January 2 through January 5, 2018. This section summarizes the facts from that jury trial.

Beau Westover (Westover) lives in Mission next to a business known as Cherry-Todd Electric. Cherry-Todd Electric has a fenced yard with equipment within it. In November of 2016, Keller Electric was doing contract work for Cherry-Todd Electric and had parked equipment and placed property within the fenced yard of Cherry-Todd Electric.

Westover had a gun collection within his home of some 16 or 17 shotguns and other firearms. Westover had other personal property in his fully furnished home in November of 2016 as well. Over Veterans Day weekend in 2016, which was November 11 through 13, 2016, Westover left his home to go camping in the Black Hills of South Dakota. When Westover returned to his home in Mission, basement windows were broken out, his door was unlocked, his home was ransacked, and much of his property had been stolen, including his gun collection.

His gun collection included a Savage .204 caliber rifle bearing serial number J365798, and a Benelli SuperNova .12 gauge shotgun bearing serial number Z718035H14.

Cherry-Todd Electric discovered that its chain link fence had been cut with holes on the east side of the yard and on the west side of the yard. The Westover home was close to where one of the holes were cut, and the home where Jesse and his brother and codefendant Jeremy lived was close to where the other hole was cut. Copper wire on spools and some other items belonging to Cherry-Todd Electric had been stolen from the yard, but the value of the stolen Cherry-Todd Electric property was below $1,000. Cherry-Todd Electric notified Kirby Keller of Keller Electric about the larceny. Kirby Keller went to Cherry-Todd Electric and discovered that items from Keller Electric trucks parked in the Cherry-Todd Electric fenced yard had been stolen, with those items valued at $2,561.75.

Three of Jesse's codefendants testified at the jury trial, two of whom had direct knowledge concerning the burglary and larceny over Veterans Day weekend. White Eyes had met Jesse earlier in 2016 and had begun hanging out with Jesse at the home where he and Jeremy lived. White Eyes, during the weekend of November 11 through 13, 2016, was with Jesse at the Waln home. That home belonged to Jesse and Jeremy's mother, Debra Waln (Debra), but Debra had been ill and was staying elsewhere in 2016. Debra had allowed Jesse to use her white Chevrolet Impala during that time, and witnesses associated the white Impala as being Jesse's car. The Waln home where Jesse and Jeremy stayed had a detached garage, and Jeremy's two preschool age children and the children's mother Star Eastman also lived off and on in the Waln home.

On or about the night of November 11, 2016, at the Waln home, Jesse had allowed White Eyes to use his phone. White Eyes saw a message from Jeremy on Jesse's phone to the effect of

3

"can you come and get me?" Jesse took the phone back, and drove in the white Impala with White Eyes to an alley near the Boys and Girls Club in Mission, near to where the Westover home is located. It was the nighttime. According to White Eyes, Jesse backed the car up to where Jeremy was standing next to a pile of stuff and then helped Jeremy load items into the trunk, such as spools of copper wire and property from the Westover home (a chainsaw, weed eater, big flat screen television). White Eyes served primarily as a lookout, but helped a bit in loading items that night. Jesse did not say anything about the stuff or to his brother, but simply loaded the items up. Jeremy got into the backseat alongside the big flat screen television, and Jesse drove the car back to the Waln home, backing the vehicle up to the side door of the garage. Jesse and Jeremy then unloaded the stuff into the garage. Jesse again made no comment about the items according to White Eyes.

The next night, on or about November 12, 2016, White Eyes was with Jesse when Jeremy called Jesse in the nighttime. Jesse again drove the white Impala with White Eyes in the passenger seat to the same location, parking near a pile of different stuff. Jesse again helped Jeremy move the stuff into the trunk and into the backseat, while White Eyes served as a lookout. During both such trips, Jesse had the lights of his car turned off when he was in the vicinity of the Boys and Girls Club and in the alley. White Eyes remembered a pair of turquoise cowboy boots and a gun contained in a black case, which turned out to be the Benelli shotgun being taken into the car on the second night. Again, the group unloaded the items at the Waln garage and house.

On the final night, on or about November 13, 2016, White Eyes remembered Marshall joining Jeremy and Jesse, which Marshall confirmed when he testified. Jeremy asked Marshall to help him move stuff in exchange for a cut of the stuff. Marshall accompanied Jeremy to the

Westover home, where there were broken windows to enter through the basement. Marshall looked for things of value, and took firearms, a laptop, a wallet, and knives. While in the home Marshall drank from a juice container, which he left behind and which later was taken into evidence, tested, and found to have Marshall's DNA on it. Marshall helped Jeremy stack items outside the Westover home. Marshall then carried property back to the Waln garage going around the Cherry-Todd Electric property, while Jeremy took items back by cutting through the yard of Cherry-Todd Electric. Jesse did not accompany Jeremy or Marshall inside of the Westover home on that night. Marshall took with him to the home where he was living two guns, a wallet, cellphone, and knives. Those items later were seized from the home where Marshall lived when Rosebud Sioux Tribe law enforcement executed a search warrant.

Meanwhile, White Eyes stayed back with Jesse when Marshall and Jeremy went to the Westover home. Jesse moved and organized stuff in the garage at that time. White Eyes remembered seeing guns being brought back by Jeremy and Marshall.

The next morning, White Eyes saw Jesse and Jeremy place guns, boots, and other property in the white Impala. Jesse then drove the white Impala with White Eyes as a passenger out to the residence of Jesse's father, Calvin Waln, Sr. Jesse got out of the car and hid items, including the Benelli shotgun in a black case and other such items, in a shelterbelt and under abandoned cars.

Later, Jesse drove with White Eyes in the car to a rural location to meet with Mark O'Leary (O'Leary). Jesse wanted to trade guns to O'Leary for methamphetamine and cash. White Eyes and Jesse were using methamphetamine together. White Eyes saw Jesse give two guns to O'Leary in exchange for methamphetamine and possibly cash. Law enforcement later recovered Westover's Savage .204 rifle bearing serial number J365798 from O'Leary. O'Leary,

who is facing possession of stolen firearm charges under a separate indictment, did not testify at trial.

Debra had cancer and was hospitalized in mid-November of 2016. Debra's oldest son, Calvin "Hawkeye" Waln, Jr., was captain of the police of the Rosebud Sioux Tribe in November of 2016, and had served for a number of years as a law enforcement officer on the Rosebud Sioux Tribe Indian Reservation. Captain Waln is well known as "Hawkeye" and for the sake of avoiding confusion with his father who bears the same first name and his brothers who were charged in this case, this Opinion and Order refers to him as "Hawkeye." Hawkeye was with Debra at the hospital when the decision was made to fly Debra to Sioux Falls for enhanced medical care because of her condition. Debra asked Hawkeye to call Jesse to the hospital, and Hawkeye did so. Jesse drove the white Impala to the hospital, and White Eyes came along as a passenger, though she stayed in the car while Jesse was inside the hospital. Hawkeye was completely unaware at the time of his brothers' involvement in any burglary and larceny. When Jesse arrived, Hawkeye discussed with him their mother's health, and Jesse said something to the effect that he wanted to talk with Hawkeye because something wasn't right or because "they had messed up" and were probably going to get in trouble. Hawkeye told Jesse to text or contact him later, understandably focused on his mother's health. Jesse did not text or call Hawkeye to report what was occurring or to explain what Jesse meant by his statement. Meanwhile, Hawkeye had heard that Jeremy's significant other—Star Eastman—wanted to talk with Hawkeye about something, and Hawkeye had responded that she should then come in and meet with him.

On November 17, 2016, Star Eastman (Eastman) went to the Rosebud Sioux Tribe Law Enforcement Center and met with Hawkeye. Eastman had been living at times with Jeremy in the Waln home and had two very young preschool aged children with Jeremy. Eastman told

6

Hawkeye that Jeremy, Jesse, White Eyes, and Marshall had been in the Waln home, had not been sleeping much during a four-day period, and had been involved in breaking into a home and stealing guns. Eastman reported that she had gone with Jeremy to the Calvin Waln, Sr. property where Jeremy had stored items and said guns were located. Eastman had seen gold coins and $2 bills (property that Westover had reported being stolen) as well as other property she believed to have been stolen. At trial, Eastman made clear that she did not know whether Jesse had actually stolen anything. No one during trial or during the investigation implicated Eastman in the burglary or larceny.

Hawkeye immediately told Rosebud Sioux Tribe Chief of Police Marlin Enno of what Eastman had reported. Chief Enno, Hawkeye, and Rosebud Sioux Tribe law enforcement officers Gerald Dillon and Luke Black Bear obtained permission to search at the Calvin Waln, Sr. property, drove to the property, and split into groups of two. Officer Black Bear located the Benelli SuperNova .12 gauge shotgun in a black case, which Westover later identified as being one of the guns stolen from his residence. Officer Black Bear, who was searching with Chief of Police Enno, also located other property that had been stolen from Westover and from the Cherry-Todd Electric yard including Keller Electric property.

Meanwhile, Jesse was attempting to dispose of certain stolen property. Jesse met up with his longtime friend Moran. Moran had driven his van to Jesse's home and saw some of the property that had been stolen. Jesse loaded up copper wire into Moran's van, among other things. Moran drove as Jesse, White Eyes, and another man went to a pawn shop in Valentine, Nebraska to try to sell the copper wire and other items. The Valentine pawn shop was not interested in the copper wire, although another item from the Westover home was pawned there. Moran, Jesse, White Eyes, and the fourth individual then went to Geno's Bait Shop in Mission.

Images from a security camera picture Jesse bringing copper wire into Geno's Bait Shop and picture Jesse and Moran within Geno's Bait Shop. Trial Ex. 66. Jesse was paid $163.75 in cash on November 14, 2016, for the copper wire. Trial Exs. 64, 65. Jesse signed a receipt book with the alias "Derek Walking Eagle." Moran testified at trial that he drove Jesse to Geno's Bait Shop, was with Jesse at Geno's Bait Shop, that the surveillance photographs are in fact of Jesse and of Moran at Geno's Bait Shop, that they got paid money for the copper wire there, and that no Derek Walking Eagle was present or involved in the transaction.

Moran then drove Jesse, White Eyes, and the fourth individual to Rapid City for Jesse to sell one of the stolen guns. The group was unable to pawn the gun in Rapid City. Moran then contacted someone he knew in Rapid City, who in turn directed them to a house on Haines Avenue in Rapid City where a gun might be traded or sold. Jesse got out of the car with the gun, went into the house with the gun, and came out of the house without the gun but with methamphetamine. The group then used methamphetamine during the car ride back to Mission. White Eyes and Moran testified consistently regarding these events.

On November 17, 2016, Rosebud Sioux Tribe law enforcement executed a search warrant on the Waln home. Hawkeye was not involved in seizing evidence,[2] but was present to enter the home and take the two preschool age children of Jeremy (who were Hawkeye's nephew and niece) out of the home and away from their father in the least traumatic manner possible. Within the Waln home and garage, Rosebud Sioux Tribe law enforcement seized numerous items of personal property that belonged to Westover, as well as some items that belonged to Keller

---

[2] Hawkeye, in November of 2016, was the backup to the evidence technician of the Rosebud Sioux Tribe law enforcement office. Because the evidence technician was unavailable due to a medical issue, Hawkeye ended up checking the items in at the law enforcement center. There was no issue about items going missing or any other impropriety. Rather, all evidence indicates that Hawkeye acted forthrightly and honestly as a law enforcement officer.

Electric, an empty wire spool, and other items related to the burglary of the Burnette/Diekhoff home. Trial Exs. 72–91. Jesse and Jeremy were arrested at the Waln home. Westover's turquoise cowboy boots were found in the white Impala typically driven by Jesse. Trial Ex. 84. A search of the home where Marshall lived then occurred, which recovered further items stolen from Westover. Trial Exs. 44–92. Calvin Waln, Sr. later found a chainsaw at his property and brought that into the police department, and the chainsaw was identified as stolen property as well.

Rosebud Sioux Tribe law enforcement special agents Robert Sedlmajer and Kory Provost met with Jesse in custody, provided him his Miranda rights, and interrogated Jesse after Jesse had voluntarily and knowingly waived his Miranda rights. Jesse said that Jeremy and Marshall had stolen guns and other property from a house of someone who was not home and that Jesse had seen a number of guns. Jesse admitted seeing a Benelli shotgun. Jesse admitted knowing that the guns were stolen. Jesse acknowledged being a heavy methamphetamine user and knowing about the black market to trade stolen goods for methamphetamine. Jesse said that he knew where the Benelli shotgun was, because he had taken it out to his father's property and stashed it in a shelterbelt, and indeed drew a map of where the gun should be (which corresponded with where law enforcement had already found the gun). Jesse talked about some incident where he visited O'Leary, but did not admit to selling a stolen firearm to O'Leary; Jesse's interview occurred before law enforcement had recovered the Savage rifle from O'Leary or even learned from White Eyes that Jesse had swapped two guns to O'Leary in exchange for methamphetamine. Also during the interview, Jesse admitted to involvement in the burglary and larceny of the Burnette/Diekhoff home that formed the basis of his Petition to Plead Guilty on those counts.

Jesse testified during his jury trial. Jesse acknowledged having a methamphetamine problem for the two and a half years leading up to November of 2016. Jesse confirmed that in November of 2016, he lived in the Debra Waln home with his brother Jeremy and was the primary driver of his mother's 2011 Chevrolet Impala. Jesse told the jury that he learned of the Westover burglary when he walked into the garage at his home and saw firearms taken by Jeremy and Marshall. Jesse testified that he did not know about any plan for the burglary and that he never went to the Westover home or to Cherry-Todd Electric. Jesse denied driving his car to an alley to assist Jeremy in loading items that had been stolen, thereby contradicting White Eyes's testimony. Jesse asserted that White Eyes was in a relationship with Marshall and did not know why White Eyes might lie about him. Jesse, however, acknowledged that he took White Eyes in his vehicle to visit the hospital and that he told his brother Hawkeye while there that they had messed up and probably were going to get into trouble. Jesse admitted driving to meet O'Leary in the country, but claimed that he did so to acquire two tires, that White Eyes was not with him then, and that he did not trade firearms to O'Leary for methamphetamine. Jesse had no explanation of why the Savage firearm stolen from Westover ended up in O'Leary's possession. Jesse denied going to Valentine to try to pawn items and, notwithstanding the photographs of him at Geno's Bait Shop and the testimony of Moran, denied going to Geno's Bait Shop to sell stolen copper wire. Jesse denied making any trip to Rapid City as had been described by White Eyes and Moran. However, Jesse admitted to taking the Benelli shotgun to the Calvin Waln, Sr. shelterbelt while knowing that the shotgun was stolen. He said he took it upon himself to hide the shotgun because he did not want it in his mother's home.

Randel Probst (Probst), a retired agent of the Bureau of Alcohol, Tobacco and Firearms (ATF), testified that both the Benelli shotgun and the Savage rifle had traveled in interstate

commerce. This Court overruled the defense objection to this testimony as undisclosed expert opinions, because the United States had disclosed Probst's interstate nexus report a year before trial, and the defense made no viable argument of unfair prejudice caused by Probst's testimony. Probst also testified that another firearm stolen from Westover was recovered in Rapid City as part of a separate case.

The jury returned a verdict finding Jesse guilty of possession of a stolen firearm both for the count involving the Benelli shotgun that Jesse had taken to his father's shelterbelt and the count involving the Savage rifle which White Eyes testified that Jesse had swapped to O'Leary for methamphetamine and which law enforcement obtained from O'Leary. The jury found Jesse not guilty on the theory of the United States that Jesse had aided and abetted in the burglary of the Westover home, the larceny of the Westover home, or the larceny of Keller Electric property at Cherry-Todd Electric. Jesse now files a Motion for Judgment of Acquittal or New Trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.

## II. Discussion

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). After a jury verdict, a defendant may move for or renew a motion for judgment of acquittal. Fed. R. Crim. P. 29(c)(1). When considering a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government, resolves conflicts in the government's favor, and accepts all reasonable inferences that support the verdict. U.S. v. Santana, 524 F.3d 851, 853 (8th Cir. 2008); U.S. v. Frederick, 775 F. Supp. 2d 1146, 1162 (D.S.D. 2011). "The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the

11

defendant guilty beyond a reasonable doubt." U.S. v. Moore, 108 F.3d 878, 881 (8th Cir. 1997); U.S. v. Hood, 51 F.3d 128, 129 (8th Cir. 1995) ("Jury verdicts are not lightly overturned."). This Court does not make credibility determinations when reviewing the evidence under a motion for acquittal; such determinations are the province of the jury. United States. v. Stegmeier, 701 F.3d 574, 578 (8th Cir. 2012).

The standard for granting a new trial is different from the standard for granting judgment of acquittal. Under Rule 33 of the Federal Rules of Criminal Procedure, this Court "may vacate any judgment and grant a new trial if the interest of justice so requires." When evaluating a motion for a new trial on the basis of insufficient evidence, "the district court is not required to view the evidence in the light most favorable to the verdict; instead, [it] may weigh the evidence and judge witness credibility for itself." United States v. Clayton, 787 F.3d 929, 935 (8th Cir. 2015). However, a "jury's verdict must be allowed to stand unless the evidence weighs heavily enough against the verdict [such] that a miscarriage of justice may have occurred." Id. (alterations in original) (internal quotations omitted) (quoting United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir. 2007)). The power of the court to grant a new trial should be invoked only in an exceptional case where the evidence preponderates heavily against the verdict. U.S. v. Starr, 533 F.3d 985, 999 (8th Cir. 2008). "As a general rule, the decision whether to grant or deny a motion for a new trial lies within the discretion of the district court." U.S. v. McMahan, 744 F.2d 647, 652 (8th Cir. 1984). Such authority, however, "should be exercised sparingly and with caution." U.S. v. Cole, 537 F.3d 923, 926 (8th Cir. 2008) (quoting United States v. Sturdivant, 513 F.3d 795, 802 (8th Cir. 2008)).

Jesse was convicted on two counts of possession of a stolen firearm under 18 U.S.C. § 922(j). The elements of that offense are: 1) that Jesse knowingly possessed, received,

concealed, stored, bartered, sold or disposed of a firearm (the Savage .204 caliber rifle with regard to one count and the Benelli SuperNova .12 gauge shotgun with regard to the other count); 2) that the firearm was stolen; 3) that Jesse knew or had reasonable cause to believe that the firearm was stolen; and 4) that the firearm at some time had been shipped or transported in interstate commerce. United States v. White, 816 F.3d 976, 985 (8th Cir. 2016). Jesse's primary argument about insufficiency of the evidence to sustain the conviction and about justice requiring a new trial is that the "Jury could not have reasonably found the guns had traveled in interstate commerce." Doc. 359 at 3–4. Jesse had filed a motion in limine to prohibit introduction of opinion evidence that the weapons in question had traveled in or affected interstate commerce, asserting that the Government had failed to identify an expert to testify to such an opinion. Doc. 283 at ¶ 8. This Court denied that portion of the motion in limine and overruled Jesse's objections upon learning that the Government had disclosed in January of 2017, nearly a year before trial, an interstate nexus report signed by ATF Special Agent Probst. Doc. 353-1. This Court then allowed Probst to testify during trial that he had been a special agent of the ATF for 30 years and that he inspected both the Savage .204 caliber rifle bearing serial number J365798 and the Benelli SuperNova .12 gauge shotgun bearing serial number Z718035H14. Probst testified that the Benelli shotgun was manufactured in Italy and imported into the United States, and further that the trace summary revealed the gun's original purchaser was Westover. Probst also testified that the Savage rifle was manufactured by Savage Arms in Westfield, Massachusetts, and that the trace summary revealed that the gun's original purchaser was Westover.

Testimony from a special agent of the ATF is admissible in a possession of stolen firearm case to establish an interstate commerce nexus. United States v. Spight, 817 F.3d 1099, 1103

(8th Cir. 2016). Jesse's argument appears to be that, although the Government had disclosed Probst and the interstate nexus report nearly a year before trial, the Government should have filed a separate disclosure of Probst as an expert witness. Jesse, however, did not question the validity of the expert testimony, request a continuance or make any argument about any unfair prejudice of any nature. Under the circumstances, this case is similar to United States v. Kenyon, 481 F.3d 1054 (8th Cir. 2007), where the Eighth Circuit declined to find error when the government presented expert testimony not disclosed in a pretrial filing when the defendant made no argument of prejudice from the lack of notice. Id. at 1061–62. Here, Jesse had notice of the interstate nexus evidence and Probst's report from January of 2017, and has no viable argument that the absence of a separate expert disclosure of Probst prejudiced the defense. Doc. 353-1.

The remaining three elements of the crime of possession of a stolen firearm are well supported by the evidence. Jesse himself admitted to knowing that the firearms he saw were stolen and that he himself took the Benelli firearm into his possession, drove it to his father's shelterbelt outside of Mission, and concealed it in the shelterbelt. Jesse denied selling the Savage rifle to O'Leary for methamphetamine, but the evidence was ample that he did so. White Eyes went with Jesse on the trip to visit O'Leary and observed Jesse providing two guns to O'Leary in exchange for methamphetamine and possibly money. Rosebud Sioux Tribe law enforcement recovered from O'Leary the Savage rifle stolen from Westover. Jesse's explanation that he had visited O'Leary to buy two tires and had seen Tim Grablander on his way back to his home that day was directly contradicted by Grablander's testimony that he was in Wisconsin for a conference and not in Mission that day.

Jesse also argues that the evidence was insufficient that he possessed the Savage rifle recovered from O'Leary. The evidence, however, clearly established that Westover owned the Savage rifle, that the Savage rifle was among those stolen from Westover between November 11 and 13, 2016, that Jesse knew that a number of firearms had been stolen and were at the Waln residence and garage, and that Jesse sold or traded two of those firearms to O'Leary. While it is true that White Eyes could not identify precisely the two guns that Jesse sold or traded to O'Leary, the evidence established that the Savage rifle was recovered from O'Leary, and there was no other explanation of how O'Leary could end up with Westover's stolen Savage rifle, other than through the transaction with Jesse. Simply because Jesse described a different transaction of buying tires from O'Leary does not thereby render the evidence insufficient that Jesse was the one who transferred possession of the stolen Savage rifle to O'Leary. The evidence sufficiently established that Jesse had possession of the Savage rifle knowing it had been stolen, and neither a new trial nor a judgment of acquittal is justified.

### III. Conclusion

For the reasons explained in this Opinion and Order, it is hereby

ORDERED that Jesse's Motion for Acquittal or a New Trial, Doc. 358, is denied.

DATED this 5th day of February, 2018.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE